2020 IL App (1st) 181456-U
No. 1-18-1456

SECOND DIVISION
January 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ENRIQUE MEZA, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16 L 10959 |
| | ) | |
| COUNTRY MUTUAL INSURANCE | ) | |
| COMPANY, | ) | The Honorable |
| | ) | Thomas Mulroy, Jr., |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court erred in granting summary judgment in favor of the insurer where (1) the insured's suit was timely filed because the insured was required to request a proof of loss but never did; (2) the insurer's denial of coverage of additional costs was premature; (3) the Standard Fire Policy superseded the insurer's policy as to the length of time the insured had to make repairs and replacements to his house; and (4) a question of fact existed as to whether the insured took a reasonable time to make the repairs and replacements to his home.

¶ 2    Enrique Meza bought and paid for an insurance policy from Country Mutual Insurance

Company ("Country"). Policy number A12K8030571 was issued for the period November 18,

2013, through November 18, 2014, for his home at 4611 South Talman Avenue, Chicago, Illinois. The limits of liability for the dwelling were $192,000. The policy insured against fire damage.

¶ 3 The home was damaged by fire on July 11, 2014. On July 12, 2014, Meza gave notice of loss to Country. Country asked Meza to sign a "Financial Authorization Form and Consent to Inspect and Examine the Property," which Meza signed. Meza's personal tax return for 2013 was provided and a personal property inventory was submitted. Country worked with Meza's public adjustor to develop a scope of loss. Country was, therefore, aware of the nature and extent of the loss. Claim number 104-0047528 was assigned to the loss.

¶ 4 After repairing part of and replacing part of his property, Meza filed a final claim with Country. Country denied the claim, and Meza sued. After almost three years of pleadings, motion practice, mandatory arbitration, an amended complaint and mutual motions for summary judgment, both motions for summary judgment were denied and the case was set for trial. During a hearing on motions *in limine* the court granted Country's previously filed motion for summary judgment.

¶ 5 Meza appeals from two trial court orders entered on March 7, 2018, and June 7, 2018, respectively. The March 7, 2018, order states: "1) Country's Motion for Summary Judgment is denied; 2) Plaintiff's Motion for Summary Judgment is denied; 3) Trial date and pretrial conference to stand." The June 7, 2018, order states:

> "This matter, having come before the court on pre-trial and renewed motion for summary judgment, the court having jurisdiction and being fully advised on the premises it is hereby ordered: 1) for reasons stated on the record, the court grants Country Mutual summary judgment in its favor; 2) this matter is dismissed with prejudice; 3) the June 13, 2018 trial date is stricken; 4) parties are responsible for their own costs."

¶ 6    The reasons given on the record appear to be based on the court's conclusion that because Meza elected to accept the check for actual cash value and did not complete the work on his home within one year of the fire that Country was entitled to summary judgment.

¶ 7    We note that Country's motion for summary judgment was based on its claim that the suit was not timely filed, that is, within one year of the date of the occurrence. However, the parties argued many points previously raised in pleadings at this, the only hearing on any issue, so it appears that the court conflated the one year suit limitation with the one year repair/replacement provision of the policy since both were orally argued by Country.

¶ 8    For the reasons that follow, we affirm the March 7, 2019, order and reverse and remand the order of June 7, 2018, granting summary judgment to Country.

¶ 9    BACKGROUND

¶ 10    After Meza notified it, Country asked Meza to sign a "Financial Authorization Form and Consent to Inspect and Examine the Property," which Meza signed. Meza's personal tax return for 2013 was provided and a personal property inventory was submitted. Country worked with Meza's public adjuster to develop a scope of loss. Country was, therefore, aware of the nature and extent of the loss. Claim number 104-0047528 was assigned to the loss.

¶ 11    On September 4, 2014, the parties' respective adjusters inspected the property and reached an agreement on the replacement cost ("RC") of the damaged property. That amount was $187,567.05. Country then used that figure to calculate the actual cash value ("ACV") amount, $128,854.66. Country calculated the depreciation holdback amount as $33,312.39.

¶ 12    Country admitted in its Answers to Meza's Motion for Summary Judgment that it never specifically requested a "proof of loss." Country did, however, refer to all of the policy requirements in its letters to Meza.

¶ 13    On September 4, 2014, Country sent Meza a letter[1] from Charles Warren, its agent, confirming that a replacement cost policy was in effect on the date of the fire, that the limit of coverage on the dwelling was $195,907.00. The structure was covered under Loss Settlement 1 of the policy. It continued:

> "Please note that one of the very important requirements for the replacement cost coverage is that the actual repair or replacement must be complete and submitted to us within one year from the date of loss'. [] This letter will also serve as a reminder of the one-year limit contained in your policy as noted throughout the letter. You will have one year from the date of loss to present documentation regarding this claim as noted above. Your one-year deadline is July 11, 2015."

¶ 14    On September 19, 2014, Country issued a check to Meza for the ACV, or $128,854.66, which according to Country represented the RC, $187,567.05, minus an agreed depreciation amount of $33,312.39. We note that $187,567.05 minus 33,312.39 actually equals $154,254.66, and there does not appear to be an explanation for the lower amount being tendered.

¶ 15    Meza intended to repair parts of the property and replace some other parts of it. Country knew of this intention. The policy requires the repair/replacement to be completed within one year from the date of loss. However, as seen below, the Country policy includes a Conformity to Statute clause, which amends that timeline to a "reasonable time."

¶ 16    On November 11, 2014, Country sent a letter to Meza stating that the policy spoke of a reasonable time frame in which repairs to the property must be completed. The letter also warned

---

[1] Country's letters of September 4, 2014, November 11, 2014, and January 5, 2015, were provided in the record by Country.

that the insured had only one year from the date of the occurrence to complete the repairs if he wanted to claim the depreciation holdback.

¶ 17    In December 2014, Meza hired an architect to complete the required permit drawing to repair/replace fire damage for the dwelling.

¶ 18    On December 1, 2014, Meza hired a contractor to complete the work to repair the property for the replacement cost value of $187,567.05 plus all other insurance proceeds related to the completion the repairs to the building portion of the property. During the process of applying for the necessary permits it was discovered that code upgrades were necessary on the property's electrical, plumbing, and HVAC systems.

¶ 19    On December 29, 2014 Country sent an email to Meza from its agent, William Talman, confirming: "Yes—there is CODE coverage on this loss…$19,597.00 However, please be aware that per our regulations, code costs must [be] itemized and be verified by the code language." Country admitted in its answer to the amended complaint that the required code upgrades were within the provided coverage up to $19,200.00. The email to Meza from Charles Warren confirmed that the code coverage under the policy is $19,597.00.

¶ 20    On January 5, 2015, Country sent another letter to Meza, this time advising him that his claim remained open pending completion of the repairs and noting that it was important that the repairs be completed within a "reasonable time," adding, "We realize that your contractor may have to have plans drawn to satisfy the City of Chicago [("City")] and this may take some time…However, the important thing is that he gets started so he can finish in a reasonable time frame." This letter also included the caution that repairs and replacement needed to be completed within one year from the date of occurrence if Meza wanted to claim the depreciation holdback, or full replacement cost.

¶ 21    The final inspection by the City was completed on October 3, 2015. The inspection resulted in an "approved" decision by the City.

¶ 22    Country's total exposure for the property repair and replacement to Meza under this policy, including its endorsements is, therefore, (its figure) $195,907.00 plus code upgrades (its figure) of $19,597.00, or $215,504.00.

¶ 23    On October 15, 2015, The Contractors of Illinois, Ltd. ("Contractors") gave Meza an invoice which shows that they billed Meza $187,567.05 for repairs and replacement plus $19,200.00 for code upgrades, or $206,767.00. Contractors credited as paid by Meza, $128,854.66 plus $25,000.00, or $153,854.66, leaving a balance due of $52,912.39. Country paid Meza the ACV, or 128,854.66, for the repair and replacement of the property within weeks of the fire.

¶ 24    On October 22, 2015, Meza, through his adjuster, requested payment of $52,512.39,[2] the total of the depreciation holdback, $33,312,59 and code upgrades, $19,200.00. His adjuster did not appear to request Country's estimate for code repairs, or $19,597.00. There is no explanation for this in the record.

¶ 25    In response, on November 9, 2015, Country sent another letter to Meza from its agent, Williams Warren, advising that it would not provide any additional coverage because:

> "Mr. Meza the time frame wherein all aspects of your claim were to have been submitted to us has lapsed. The documentation provided by you and or your representative was not submitted within the time allotted per policy. We are not able to afford any additional payments on the above referenced claim."

---

[2] The invoice says $52,512.39 but $206,769 – 153,854.66 = $52,912.34. We consider the $0.05 difference *de minimus* and will continue to use $52,512.39 as the amount sought by Meza

¶ 26    The letter reiterated the language under "Conditions Sections 2-6: B. Duties After Loss ***

10. Notwithstanding any other provisions in Sections 2 through 6 all claims under this policy must

be brought within one year of the date of 'occurrence.' " The letter also stated:

> "We would call your attention to the following policy language: G. Suit Against
>
> Us: No action can be brought against 'us' unless there has been full compliance with all of
>
> the terms under Sections 2 through 6 of this policy and the action is started within one year
>
> after the date of 'occurrence.' "

¶ 27    The letter did not reference the "reasonable time" to repair/replace in the SFP nor the

Conformity with Statute clause of the policy, nor the policy endorsement, 044IL-10, which

includes the following language: "However, this one year period is extended by the number of

days between the date proof of loss is submitted and the date the claim is denied in whole or in

part," thus, extending the time to sue.

¶ 28    We note that at no time did Country tell Meza the number of days left for him to file suit,

as is required in Illinois:

> "When the period within which the insured may bring suit under a residential fire
>
> and extended coverage policy is tolled in accordance with Section 143.1 of the [Illinois
>
> Insurance Code ("Code") (215 ILCS 5/143.1 (West 2014))], the company, at the time it
>
> denies the claim, in whole or in part, shall advise the insured in writing of the number of
>
> days the period was tolled, and how many days are left before the expiration of the time to
>
> bring suit." 50 Ill. Adm. Code 919.80(d)(8)(C) (eff. July 22, 2002).

¶ 29    The $128,854.66 ACV already paid to Meza for the property repair/replacement plus the

amount he is now claiming, $52,912.39, equals $181,758.05 which is less than the face value of

the policy ($192,000), less than Country's admission of the policy coverage ($195,907.00), less

than Country's admission of the policy coverage plus the code upgrades ($195,907.00 + $19,597.00 = $215,504.00), and only slightly more than Country's own replacement cost estimate ($187, 567.05).

¶ 30    The final claim was submitted to Country on October 22, 2015, and on November 9, 2015, Country denied the claim. In its answer to Meza's complaint, Country admitted that the November 9 letter was a *denial*.

¶ 31    Meza contends that the court erred when it granted summary judgment in favor of Country.

¶ 32    Meza instituted the present action against Country on November 11, 2016, seeking the depreciation holdback of $33,312.39 plus $19,591.00 for code upgrades, or $52,903.39, or very slightly more than the invoiced balance due on for the repairs on his property ($52,512.39).

¶ 33    Meza's complaint alleged breach of contract, statutory damages including attorney's fees for Country's unreasonable and vexatious delay, and prejudgment interest. The breach of contract claim was based on Meza's assertion that Country had a duty to pay the RC in total at the conclusion of the repairs subject to the contract and the agreement of Country's representative.

¶ 34    On May 12, 2017, Country filed its answer and affirmative defenses to Meza's complaint. Country (1) admitted that it denied coverage for the additional amounts sought; (2) admitted that it denied the coverage for those amounts on November 9, 2015; (3) denied that any further amounts sought were due to Meza; (4) denied breaching the contract; (5) denied its actions were vexatious and unreasonable; and (6) denied that Meza was entitled to pre-judgment interest. Country alleged affirmative defenses that (1) Country paid Meza the ACV, and since Meza did not complete the repair or replacement of his dwelling within one year from the date of loss, Meza is not entitled to any additional sums; and (2) Meza's suit is barred by the policy's one-year time limit.

¶ 35    Between November 11, 2016, and November 17, 2017, the parties engaged in mutual motion practice, requests for production, interrogatories, and various objections.

¶ 36    On July 27, 2017, a Commercial Calendar mandatory arbitration award of $52,512.39 plus costs of $582.25 was awarded to Meza. Country rejected the award the same day.

¶ 37    On November 17, 2017, Country filed a motion for summary judgment, claiming that Meza's suit is time barred by the terms of the policy; that Meza's breach of contract claim is time barred by the policy; and that therefore he cannot maintain a stand-alone bad faith claim or statutory pre-judgment interest claim.

¶ 38    On December 20, 2017, following motion practice on the complaint, Meza filed a three-count amended complaint claiming that Country 1) breached the insurance contract; 2) that statutory damages should be awarded due to Country's vexatious and unreasonable delay in paying Meza's claim; and 3) seeking prejudgment interest.

¶ 39    In the amended complaint, Meza alleged that on the day following the fire, July 12, 2014, he gave notice of the loss to Country, who accepted the notice in lieu of a formal proof of loss. Meza based his breach of contract in the amended complaint on his allegations that (1) Country never requested a proof of loss; (2) Country and Meza agreed on the RC of $187,567.05; (3) in issuing the check for the ACV, $128.854.66, Country held back the agreed depreciation, or $33,312.39; (4) Meza never told Country he was electing to accept the ACV instead of the RC; (5) Country's November 11, 2014, letter to Meza said Meza had a reasonable time to complete the repairs and replacement, and Country acknowledged the plans would have to satisfy the City of Chicago; (6) Country sent another letter to Meza on January 5, 2015, saying the claim was still open; (7) Meza filed his final claim on October 22, 2015, for the depreciation holdback, $33,312.39, plus $19,200.00 in code upgrades, plus 7 months of storage fees; and (8) Country

issued a letter on November 9, 2015, telling Meza it would not pay any additional funds, but did not tell Meza about the tolling of his time to sue, and did not refer to the Conformity to Statute clause of the policy.

¶ 40    Meza argued that Country had a duty to pay the full replacement cost of $187,567.05. Meza cited the Conformity to State Statutes section of the policy, which provides that the policy is "amended to conform to such statutes." Meza further cited that under Illinois law and the Standard Fire Policy ("SFP"), Meza had a "reasonable time" to repair and replace the property that extended beyond the one-year time limit. According to Meza, Country also had a duty to pay for code upgrades and for 7 months for contents storage expenses. Meza alleged that Country breached these contractual duties, and its failure to pay the benefits due was also vexatious and unreasonable, which entitled Meza to attorney fees and sanctions under section 155 of the Code (215 ILCS 5/155 (West 2014)). Meza also claimed he was entitled to prejudgment interest pursuant to section 2 of the Illinois Interest Act (815 ILCS 205/2 (West 2014)).

¶ 41    Meza attached copies of bills and receipts for the repair and replacement of his dwelling; the building permit issued by the City of Chicago on February 27, 2015; a summary of all city inspections including the final inspection on October 3, 2015; a copy of the December 14, 2014, email from Charles Warren, Country's agent, confirming that code updates up to $19,597.00 were covered under the policy; a copy of the SFP for Illinois; and a certified copy of the instant insurance policy with Country.

¶ 42    On January 30, 2018 Country filed an answer to the amended complaint, denying that the SFP supersedes its policy, or that additional sums were available under the policy for code upgrades. Country also asserted that it did not breach its contract with Meza, that its conduct was

not vexatious or unreasonable, that Meza did not suffer any damages, and that Meza was not entitled to prejudgment interest.

¶ 43    As affirmative defenses, Country alleged that Meza had waived any depreciation holdback by accepting, endorsing, and cashing the ACV check for $128,854.66 after it was issued and failing to seek the depreciation holdback within one year of the date of loss. Country also reiterated the conditions for all claims and that Number 10 of those conditions states that all claims under this policy must be brought within one year of the date of occurrence. Country admitted that its letters to Meza on November 11, 2014, and January 5, 2015, both referenced a "reasonable time" to complete repairs. Nonetheless, Country also noted that those letters included a caution:

> "We realize that your contractor may have to have plans drawn to satisfy the City of Chicago and this may take some time. However, the important thing is that he gets started so he can finish in a reasonable time frame. *** You will have one year from the date of loss to present documentation regarding the claim as noted above. Your one-year deadline is July 11, 2015."

Country alleged that on or about November 9, 2015, it denied the coverage requested by Meza on October 22, 2015, because Meza failed to repair or replace his dwelling within one year. Thus, Meza was not entitled to additional amounts beyond the ACV.

¶ 44    Country's affirmative defense further alleged the policy's Conformity to State Statute clause provides that Meza's one year time limit to bring suit is amended with the following language: "However, this one year period is extended by the number of days between the date proof of loss is submitted and the date the claim is denied in whole or in part." According to Country, Meza had "neither complied with the terms of the policy nor filed suit within one year of the occurrence," and so his suit was time-barred.

¶ 45   Country also denied it had a duty to pay full replacement cost; denied that all conditions have been met or waived; denied that the SFP for Illinois guarantees a minimum level of coverage which control the instant policy; denied that the SFP for Illinois provides for a "reasonable time" which supersedes the policy's one year limit to repair or replace; denied it has a duty to pay for code upgrades; denied that it has breached the contract; denied vexatious and unreasonable conduct; and denied that Meza is entitled to prejudgment interest.

¶ 46   Finally, Country argued as an affirmative defense that Meza did not have standing to sue because he was not a real party at interest, where he brought suit on behalf of his adjuster and contractor, who were affiliates; where he never received a bill from the contractor; and where he did not incur any replacement costs above the ACV.

¶ 47   In January 2018, Meza filed a motion for partial summary judgment. Meza argued that because he never elected to accept the ACV of the property in lieu of the full RC, Country was obligated under the terms of the policy to pay the depreciation holdback and code upgrades once the repairs were complete in October 2015. Meza also argued that Country bore the burden of proving any election by Meza to accept the ACV of the property in lieu of the RC.

¶ 48   In response, Country argued that Meza elected to accept the ACV payment, as evidenced by Meza's receipt and cashing of the ACV payment from Country. Because of this election, Country argued that Meza was not entitled to recover the depreciation holdback unless he completed the repairs to the property within one year of the fire, which Meza failed to do. In addition, Country argued that Meza failed to prove that he suffered any pecuniary loss above the ACV payment he received from Country.

¶ 49   Country also filed its own motion for summary judgment, arguing that Meza's suit was time-barred under the policy because it was not brought within one year of the fire. In response,

Meza argued that the policy's one-year limitation was tolled because Country never denied his claim. Alternatively, Meza argued that Country was estopped from raising the policy's one-year limitation as a defense because Country's investigation and negotiation of Meza's claim "reasonably induced in him a false sense of security that the loss would be settled without suit and his reliance thereon, foregoing filing suit during one year after the loss."

¶ 50   On March 7, 2018, the trial court denied Meza's motion for partial summary judgment and denied Country's motion for summary judgment. The case was ready for trial.

¶ 51   During a pretrial hearing on the parties' motions *in limine* and jury instructions, however, the parties revisited their contentions from their summary judgment motions. Namely, the parties disputed whether Meza elected to accept the ACV payment, whether Meza was required to complete the repairs within one year of the fire, and whether the policy's one-year time limitation for filing suit was tolled. Following the arguments of the parties, the trial court reconsidered its decision on the summary judgment motions and found that Meza elected to accept the ACV payment and thus was required to complete the repairs within one year to recover any additional amounts under the policy. Because he did not complete the repairs within one year, the trial court granted summary judgment in favor of Country and dismissed Meza's case with prejudice. This appeal followed.

¶ 52   ANALYSIS

¶ 53   I. The Policy, Endorsements, Exclusions, and SFP

¶ 54   A. The Policy

¶ 55   The Declarations Page of the policy indicates that Sections/Coverage includes the face limit of liability for real property damage of $192,000. Policy #A12K8030571 is a 12-month policy

beginning November 13, 2013, for 461 South Talman. Property damage includes damage resulting from fire. We quote only the relevant policy provisions.

¶ 56    The policy defines actual cash value and replacement cost as follows:

" 'Actual Cash Value' means:

a. For buildings or structures the lesser of the following, as determined by 'us':

(1) The cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques, less depreciation ***.

***

'Replacement cost' means:

a. Under [Loss Settlement 1] ***, the cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques. *** 'Replacement cost' does not include any increased cost due to applicable building codes, laws or ordinances."

¶ 57    The policy imposes as its conditions:

"C. Duties after Occurrence

In case of an 'occurrence' 'you' *** will perform the following duties that apply. 'We' have no duty to provide coverage under this policy if 'you' fail to comply with the following duties:

1. Give written notice to 'us' or 'our' agent as soon as is practical, which sets forth:

a. The policy number and the named insured shown under INSURED in the Declarations;

-14-

b. Reasonably available information on the time, place and circumstances of the 'occurrence'; and

c. Names and addresses of any claimants and witnesses;

2. Cooperate with 'us' and any retained legal counsel in the investigation, settlement or defense of any claim or suit ***.

¶ 58    The portions of section 6 of the policy that are relevant to this appeal provide:

"Optional Policy Coverages (Includes Limitations)

Each Optional Coverage applies only if it is shown in the Declarations. Nothing contained in SECTION 6 varies, alters, or expend any provisions of this policy except as provided in each optional coverage.

***

Perils Insured Against—SECTIONS 2 through 6 (Includes Limitations)

'We' insure covered property against loss caused by the following perils ***.

***

2. Fire or Lightning

***

Exclusions—SECTIONS 2 through 6

A. 'We' do not insure for loss caused directly or indirectly by any of the following.

***

1. Building Ordinance

Building Ordinance means any ordinance or law:

a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property ***. This exclusion A.1.a. does not apply

to the amount of coverage that may be provided for in 3. Building Ordinance under Section 5, Additional Coverages ***.

***

Conditions—SECTIONS 2 through 6 (Includes Limitations)

***

B. Duties After Loss

In case of a loss, 'we' have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to 'us'. These duties must be performed either by 'you', an 'insured' seeking coverage, or a representative of either:

1. Give prompt notice to 'us' or 'our' agent;

2. Notify the police if the loss is suspected to be in violation of a law;

***

5. Protect the property from further damage. If repairs to the property are required, 'you' must:

a. Make reasonable and necessary temporary repairs to protect the property; and

b. Keep an accurate record of repair expenses;

6. Cooperate with 'us' in the investigation of a claim;

***

8. As often as 'we' reasonably require:

a. Show the damaged property;

b. Provide 'us' with records and documents 'we' request and permit 'us' to make copies;

\*\*\*

9. Send to 'us', within 60 days of *'our' request* [(emphasis added)], 'your' signed, sworn proof of loss which sets forth, to the best of 'your' knowledge and belief:

a. The time and cause of loss;

b. The interests of all 'insureds' and all others in the property involved and all liens on the property;

c. Other insurance which may cover the loss;

d. Changes in title or occupancy of the property during the term of the policy;

e. Specifications of damaged buildings and detailed repair estimates;

f. The inventory of damaged property \*\*\*;

g. Receipts for additional living expenses \*\*\*;

\*\*\*

10. Notwithstanding any other provisions in Sections 2-6 all claims under this policy must be brought within one year of the date of 'occurrence'.

C. Loss Settlement

'We' settle covered losses according to Loss Settlement 1 [which appears on the Declarations] \*\*\*.

\*\*\*

Covered losses are settled as follows:

1. Loss Settlement 1 – 80% Insurance Requirement

If '1' appears in the Declarations under 'LOSS STLMT':

a. 'We' pay 'replacement cost' unless paragraph b. applies. ***

b. If the applicable limit of liability for the damaged property is less than 80% of its 'replacement cost' at the time of loss, 'we' will pay 'actual cash value.'

***

d. 'You' may choose, at 'your' election, to accept 'actual cash value' instead of 'replacement cost'. If 'you' do so, 'you' will have one year from the date of the loss to repair or replace the damaged property and request the difference between 'actual cash value' and 'replacement cost.'

***

G. Suit Against Us

No action can be brought against 'us' unless there has been full compliance with all of the terms under SECTIONS 2 through 6 of this policy and the action is started within one year after the date of the 'occurrence'.

***

I. Loss Payment

'We' will adjust all losses with 'you' ***. Payment will be made 60 days after 'we' receive 'your' properly executed proof of loss and 'you' have complied with all the policy conditions, and:

1. 'We' reach an agreement with 'you';

2. There is an entry of a final judgment; or

3. There is a filing of an appraisal award with 'us'."

¶ 59     B. Conformity to State Statute Clause

¶ 60     The policy includes a "Conformity To State Statutes" clause, which states: "Any terms of this policy which are in conflict with the statutes of the state in which this policy is issued are amended to conform to such statutes." Notwithstanding Country's argument that the provisions of the SFP do not supersede its own policy language, it is clear that the SFP does supersede the Country policy in one critical aspect: it permits the insured a reasonable time to complete the repair/replacement of his property.

¶ 61     C. The Illinois Amendatory Endorsement (END 044IL-10)

¶ 62     Among the "Conditions: G" set forth in the policy is a provision titled "Suit Against Us," which states, "No action can be brought against 'us' unless there has been full compliance with all of the terms under SECTIONS 2 through 6 of this policy and the action is started within one year after the date of the 'occurrence'."

¶ 63     However, Meza paid for the Endorsement Form 2044 IL (10-12/07) which is, therefore, a part of the policy and which deletes all of "Conditions: G" and replaces it with the following language:

"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

ILLINOIS AMENDATORY ENDORSEMENT

THIS ENDORSEMENT INCLUDES LIMITATIONS AND RESTRICTIONS

This Endorsement changes the following sections of your policy:

\*\*\*

[In Sections 2 through 6]

Item G. Suit Against Us is deleted and replaced by the following:

G. Suit Against Us

No action can be brought against 'us' unless there has been full compliance with all of the terms under SECTIONS 2 through 6 of this policy and the action is started within one year after the date of the 'occurrence'.

However, this one year period is *extended* by the number of days between the date proof of loss is submitted and the date the claim is denied in whole or in part." (Emphasis added.)

¶ 64    If there is a conflict between the main policy and the endorsement, the endorsement will control. *Vole v. Atlanta International Insurance Co.,* 172 Ill. App. 3d 480, 483 (1988).

¶ 65    D. Standard Fire Policy for Illinois

¶ 66    Illinois has joined other states in requiring all fire policies to be uniform under the SFP. "The Director of Insurance shall promulgate such rules and regulations as may be necessary to effect uniformity in all basic policies of fire and lightning insurance issued in this State ***." 215 ILCS 5/397 (West 2014). The Director has issued an SFP that includes the following language:

"[T]his company *** does insure the named above and legal representatives to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within *reasonable time* after such loss ***." (Emphasis added.)

¶ 67    In other words, since Meza bought and paid for a replacement cost policy, Meza had a reasonable time to repair or replace the property after receiving the check for the ACV to claim the difference, as long as the claim did not exceed the amount it cost to accomplish the repair or replacement. What constitutes a reasonable time to repair or replace fire-damaged property

depends on the facts and circumstances of each case. See *Tamco Corp. v. Federal Insurance Co. of New York*, 216 F. Supp 767, 775 (1963) (interpreting Illinois law).

¶ 68    Further, "[t]he printed form *** is hereby designated as the Standard Policy for fire and lightning insurance of the State of Illinois. All policies or contracts of such insurance issued or delivered by an insurer subject to the provision of the Illinois Insurance Code or by any agent of representative thereof on any property in this State shall conform to such form of Standard Policy ***." 50 Ill. Adm. Code 2301.30 (eff. Mar. 17, 1961). Finally, "[a]ll policies written in this State shall conform to the foregoing requirements of the Standard Policy of the State of Illinois." 50 Ill. Adm. Code 2301.100 (eff. Mar. 17, 1961).

¶ 69    The purpose of the statute tolling the contractual period within which an insured must bring suit against an insurer from the date proof of loss is filed until the date the claim is denied in whole or in part is to prevent an insurance company from sitting on a claim, allowing the limitation period to run and depriving the plaintiff the opportunity to litigate her claim in court. *Burress-Taylor v. American Security Insurance Co.*, 2012 IL App (1st) 110554, ¶ 5.

¶ 70    "The Illinois Standard Fire Policy sets a minimum threshold for what fire-insurance policies must cover ***." *Streit v. Metropolitan Casualty Insurance Company,* 863 F.3d 770, 771 (2017) (interpreting Illinois law).

¶ 71    As in *Burress-Taylor,* Meza complains that the court erred because the court could have found that there was a material issue of fact about *when* the limitation period for a lawsuit ended under the policy and the endorsement. See *Burress-Taylor*, 2012 IL App (1st) 110554, ¶ 14; see also 215 ILCS 5/143.1 (West 2008).

¶ 72    Meza also argues that Country's failure to notify him in writing of the number of days tolled and the time remaining to bring suit is fatal to Country's claim the suit is time barred. See,

50 Ill. Adm. Code 919.80(d)(8)(C) (eff. July 22, 2002), and *Burress-Taylor*, 2012 IL App (1st) 110554, ¶ 16.

¶ 73    The effects of the endorsement and the SFP on the time to sue and the time to repair are compared in Appendix 1, attached.

¶ 74    II. What Does Meza Want?

¶ 75    Meza is suing Country for $52,512.39, or the total of the depreciation holdback, $33,312.59 plus code upgrades, $19,200, plus some storage costs which are not part of the property repair/replacement equation. The $128,854.66 ACV already paid to Meza plus the amount he is now claiming, $52,903.39 equals $181,758.05.

¶ 76    III. Summary Judgment

¶ 77    Meza argues that Country is not entitled to summary judgment because as a matter of law the Conformance to State Statutes clause in the policy extends the time to complete repairs to a reasonable time and the endorsement in the policy itself extends the time to sue. These contentions were raised by Meza at every step of the proceedings, including the only hearing, which was on the motions *in limine* filed by both parties. It is that hearing that turned into a decidedly informal rehearing on the parties' motions for summary judgment.

¶ 78    For the reasons that follow we reverse the grant of summary judgment to Country and remand with directions consistent with this opinion.

¶ 79    We review *de novo* a grant of summary judgment. *Abrams v. City of Chicago*, 211 Ill 2d 251, 258 (2004).

¶ 80    "Summary judgment is proper where the pleadings, affidavits, depositions, admissions, and exhibits on file reveal that there is no genuine issue of material fact when viewed in the light most favorable to the nonmovant and the movant is entitled to judgment a matter of law." *Grahman v.*

*Lakeview Pantry and the Catholic Bishop of Chicago,* 2019 IL App (1st) 182003, ¶ 18 (quoting

735 ILCS 5/2-1005(c) (West 2016)); *Abrams,* 211 Ill 2d at 257.

¶ 81     The purpose of summary judgment is not to try an issue of fact but to determine whether

one exists. *Monson v. City of Danville,* 2018 IL 122486, ¶ 12.

¶ 82     In filing cross-motions for summary judgment the parties agree that there are no genuine

issues of material fact, only a question of law is at issue and invite the trial court to decide the

issues based on the record. *Milwaukee Mutual Insurance Co. v. J. P Larsen, Inc.,* 2011 IL App

(1st) 101316, ¶ 7. The construction of an insurance policy is a question of law, subject to *de novo*

review. *Acuity Insurance Co. v. 950 W. Huron Condominium Association,* 2019 IL App (1st)

180743, ¶ 21 (quoting *Travelers Insurance Co. v. Eljer Manufacturing, Inc.* 197 Ill 2d 278, 292

(2001)). "If the words of a policy are clear and unambiguous, 'a court must afford them their plain,

ordinary, and popular meaning.' " *Id.* ¶ 21 (quoting *Travelers* at 292-93). We note that the final

order in this case the court granted Country's motion for summary judgment but did not address

Meza's cross motion for summary judgment.

¶ 83     "A plaintiff seeking to defeat a motion for summary judgment does not need to prove her

case, but she must present some factual basis that would arguably entitle her to a judgment.

*Garland v. Sybaris Clubs International, Inc.*, 2019 IL App (1st) 180682, ¶ 92 (citing *Bruns v. City

of Centralia*, 2014 IL 116998, ¶ 12). "In determining whether the moving party is entitled to

summary judgment, the court must construe the pleadings and evidentiary material in the record

in the light most favorable to the nonmoving party and strictly against the moving party." *Haslett

v. United Skates of America, Inc.,* 2019 IL App (1st) 181337, ¶ 38 (citing *Eppel v. LQ Management

LLC,* 2019 IL App (1st) 180853, ¶ 14).

¶ 84 " 'Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt.' " *Lindblad v. Nelson*, 2019 IL App (1st) 181205, ¶ 22 (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill 2d 90, 102 (1992)). Summary judgment should be denied if there is a dispute as to a material fact or if the undisputed facts could lead reasonable observers to divergent inferences. *Forsythe v. Clark USA, Inc.,* 224 Ill. 2d 274, 280 (2007). Summary judgment should not be granted unless the moving party's right to judgment is clear and free from doubt. *Pielet v. Pielet,* 2012 IL 112064, ¶ 15.

¶ 85 We acknowledge that in this case there are both material questions of fact to be decided and questions of law which are subject to *de novo* review. Both parties have at different phases of this litigation tended to ignore the plain language of the policy and the law and have at times been unreliable in their facts and inferences. However, here we cannot find that the standard for summary judgment has been met for two reasons: (1) because there appear to be unresolved material issues of fact and (2) because taking Country as the movant, Country's policy and its endorsements appear to contradict it's arguments and the court's decision that Country is entitled to judgment as a matter of law.

¶ 86 Considering the record, we cannot say that there are no material issues of fact that would support a grant of summary judgment to Country.

¶ 87 Considering the actual policy language, we cannot find that as a matter of law Country's repeated avoidance of the policy, its endorsements and the SFP leave us with no doubt that Country is entitled to judgment.

¶ 88 We take no position on whether plaintiff will ultimately be totally successful, but we do find that plaintiff has raised sufficient issues of fact such that summary judgment for Country should not have been granted.

¶ 89    IV. Material Issues of Fact

¶ 90    From the record, it appears that the court failed to determine if 15 months to repair and replace his property was a reasonable time as permitted under the SFP; whether Meza met the requirements of the policy; or whether Meza is entitled to storage costs and code upgrades; whether the fact that Country never requested a proof of loss lulled Meza into believing that he had a reasonable time, per the SFP and the letters from Country to complete his repairs/replacement; and most importantly whether Country had a duty to request a proof of loss before they could deny any coverage.

¶ 91    V. Questions of Law

¶ 92    This case raises several questions of law: Does the SFP supersede Country's policy? What effect does Country's Endorsement have on the time to bring suit; was Country required to request a proof of loss in order to get one from Meza; if Country did not request a proof of loss what effect does that have on the timing of Country's denial of Meza's claim?

¶ 93    VI. Was the Suit Time-Barred?

¶ 94    Country claimed all along that Meza's suit was time barred but the policy itself includes an endorsement extending the time to sue from one year by adding the number of days between the date the proof of loss is submitted and the date the claim is denied in whole or in part.

¶ 95    Therefore, it is important to find out about the proof of loss requirements.

¶ 96    The policy reads: "No action can be brought against 'us' unless there has been full compliance with all of the terms under Sections 2 through 6 of this policy and the action is started within one year after the date of 'occurrence'." But note, the policy also includes an Endorsement which Meza bought and paid for and which Country wrote. The Endorsement repeats verbatim the above language and then adds: "However, this one-year period is extended by the number of days

between the date *proof of loss* is submitted and the date the claim is denied in whole or in part."
(Emphasis added.)

¶ 97    The phrase "proof of loss" appears several times in the policy. It is clear that it is not an active duty of the insured, rather it is passive, coming after a request from Country:

> Page 10 of the policy: D.1. a: "Give 'us' written proof of claim, under oath, *if 'we'*
> *so request*, as soon as is practical" (emphasis added);

> Page 30 of the policy: Conditions. B. 9. "Send to us within 60 days *of our request*
> your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
> [list of items]" (emphasis added);

> Page 31 of the policy: Loss Settlement 1. I Loss Payment. "Payment will be made
> [60] [changed to 30 days by the Illinois Amendatory Endorsement page 3 of 4] after we
> receive your property executed proof of loss."

¶ 98    The Courts have held that the insured should not be required to perform what would appear to be a useless act and that the insurers blanket denial of coverage estopped the insurer from asserting the insureds failure to provide proof of loss and other documents. See *Davis v. United Fire and Casualty Co*., 81 Ill. App. 3d 220 (1980); see also *Jones v. Universal Cas. Co*. 257 Ill. App. 3d 842, 852 (1994).

¶ 99    Further, the policy and the SFP contradict Country's argument that Meza's suit was time barred, an issue that was brought up repeatedly in the pleadings and again in the only hearing in this case. That hearing on the motions *in limine* morphed in a reconsideration of the motions for summary judgment, but also appears to have conflated the one year to sue language, absent the policy endorsement, and the one year to repair/replace, absent the SFP. (See Appendix 1 for a chart comparing and contrasting the policy, the Endorsement and the SFP.)

¶ 100 "When an insurer denies liability for a loss claimed to be covered under the policy on grounds other than the insured's failure to file a proof of loss, the insurer waives compliance with the proof-of-loss requirement." *Mathis v. Lumbermen's Mutual Casualty Insurance Co.*, 354 Ill. App. 3d 854, 857 (2004). Therefore, Country cannot now use the absence of a proof of loss as a defense.

¶ 101 Country has tried to have it both ways, by first denying it ever denied the claim and also admitting that its letter of November 9, 2015, was a denial. This is material question of fact for the court. However, it is hard to believe that when an insurance company writes that it will not pay any further money on a claim that is anything but a denial.

¶ 102 Country and Meza both had appraisers inspect the property on September 4, 2014. An agreed replacement cost of $187,567.05 was determined. Country had every opportunity to weigh in on that replacement cost, and it agreed to that amount. The amount, incidentally, was less than the face replacement cost of the policy. And it is uncontroverted that Meza bought and paid for a replacement cost policy.

¶ 103 Since the replacement cost is the bottom line on a proof of loss the insurance company has not been prejudiced or surprised by this amount, in fact it calculated its own actual cash value amount based on that same replacement cost.

¶ 104 The point is that the Endorsement says the time to sue is extended by the time between when the proof of loss is submitted and the claim is denied. The policy says that Country will request a proof of loss. There never was a proof of loss because Country did not request one. Country admits it never requested one. It denied the coverage without a proof of loss. It just denied the claim without it based on Country's assertion that Meza did not complete the work within one

year of the fire. However, the SFP gives him a reasonable time to complete the work. The time to file suit therefore cannot have run, and Meza's suit is timely.

¶ 105    VII. How Much Can Meza Claim?

¶ 106    Regarding the amount of money due and owing to Meza, the policy itself says:

> " 'You' may choose at 'your' election to accept the 'actual cash value' instead of the 'replacement cost.' If you do so, you will have one year from the date of the loss to repair or replace the damaged property and request the difference between 'actual cash value' and 'replacement cost.' "

Then the SFP amends that time limit to a "reasonable time" after the loss.

¶ 107    Meza already has received and accepted the ACV.

¶ 108    He seeks additional funds for required code upgrades, and Country admits that code upgrades of $19,597 are covered. In addition, Country's email to Meza confirmed that. Whether Meza submitted the proper paperwork for the code upgrades is a question of material fact for the court.

¶ 109    Meza also seeks the depreciation holdback, or the additional $33,312.39 which was held back when Country disbursed the ACV. We have demonstrated that Meza, as a matter of law under the policy he bought and paid for, is entitled to the $33,312.39 even if he completed the repair/replacement in more than one year as long as it was within a reasonable time.

¶ 110    VIII. Did Meza Complete the Repairs/Replacement within a Reasonable Time?

¶ 111    Whether the period between July 11, 2014, and the date the work was actually completed is a "reasonable time" is a material question of fact for the court. We note that the date of the invoice for the final work is October 15, 2015, however, we do not know from this record if the actual work was completed on or before October 15, 2015.

¶ 112   The court decided that Meza had not completed his repairs and/or replacements within the one year from date of the fire as required by the policy but neither the court nor Country acknowledged that the policy's Conformity to State Statute clause incorporated the SFP "reasonable time" language to complete the work.

¶ 113   In 1895, the Illinois Supreme Court was asked to decide if an insurance policy requirement that *notice* be given immediately was to be taken literally. The court reasoned that "[i]f the notice be required to be forthwith, or as soon as possible, or immediately, it will meet the requirements if given with due diligence under the circumstances of the case, and without unnecessary and unreasonable delay, of which the jury are ordinarily to be the judges." *Knickerbocker Insurance Co.* v. *Gould*, 80 Ill. 388, 391 (1875). We recognize that *Knickerbocker* was a "notice" case and we are dealing with a time to sue and time to repair/replace case, but the finding that "forthwith, or as soon as possible, or immediately" means due diligence under the circumstances continues to resonate. *Id.*

¶ 114   The Illinois Supreme Court held that "[w]hether *notice* has been given within a reasonable time depends on the facts and circumstances of each case." (Emphasis added.) *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311-12 (2006) (citing *Barrington Consolidated High School v. American Insurance Co.,* 58 Ill. 2d. 278, 282 (1974)).

¶ 115   There is no question that in this case, notice was timely given to Country.

¶ 116   If immediate notice can be accomplished in a reasonable time with due diligence and that it is a jury question, then one can argue that repair/replacement within a reasonable time also results in a question of fact.

¶ 117   Country relies on *Saathoff v. Country Mutual Insurance Co*., 379 Ill. App. 3d 398 (2008), *Higginbotham v. American Family Insurance Co.,* 143 Ill. App. 3d 398 (1986), and *Lytle v.*

*Country Mutual Insurance Co*., 2015 Ill App (1st) 142169. However, in *Saathoff, Higginbotham* and *Lytle* the insured never repaired and/or notified the insurer. Meza did both. He notified the insurer the next day after the fire, Country came out and inspected the property and came up with an RC, and Meza completed the repair and replacement of his home.

¶ 118   Further, the policy and the SFP contradict Country's argument that Meza's suit was time barred, an issue that was brought up repeatedly in the pleadings and again in the only hearing in this case, the hearing on the motions *in limine*. It appears that hearing morphed the one year to sue language, absent the policy endorsement, and the one year to repair and replace, absent the SFP.

¶ 119   Country's policy included a Conformance to State Statute clause which incorporated the SFP which all together gave Meza a reasonable time to complete the repairs or replacement of his property not one year. The main body of the instant policy contains the following language:

> " 'You' may choose, at 'your' election, to accept 'actual cash value' instead of 'replacement cost.' If 'you' do so, 'you' will have *one year* from the date of the loss to repair or replace the damaged property and request the difference between 'actual cash value' and the 'replacement cost.' " (Emphasis added.)

¶ 120   Further, the Declarations Page includes coverage under Section 6 DD which says:

> " 'We' will not be liable for any loss under this provision unless and until actual repair or replacement is completed. 'You' may make a claim under this policy on an 'actual cash value' basis, and have *one year* from the date of loss to make the repair or replacement and request payment for the difference between the reasonable cost of repair or replacement and the amount 'we' have already paid. In no event will the total amount paid, plus the deductible, exceed the total amount actually and necessarily spent to repair or replace the existing property." (Emphasis added.)

However, the policy also includes a Conformity to State Statutes clause which reads: "Any terms of this policy which are in conflict with the statutes of the state in which this policy is issued are amended to conform to such statutes."

¶ 121    The policy, the clause and the SFP are clear: Meza had a reasonable time. The Court did not determine if 16 months was a reasonable time.

¶ 122    Looking at what is a reasonable time in this matter we note that the fire that damaged part of and destroyed part of Meza's home was on July 11, 2014. Meza hired an architect, then began the process of applying for and receiving City of Chicago building permits. The construction that finally repaired part of and replaced part of his property was complete by October 2015 when the contractor submitted his final invoice.

¶ 123    We find that Meza accepted the ACV by his act of receiving it, endorsing it and spending it, as is seen on the paid invoices presented in the record. His argument that he did not accept the ACV flies in the face of reality. Country's argument that his acceptance of the ACV resulted in his election to finish the work within one year or give up his right to the RC flies in the face of the its policy's Conformity to State Statute clause which incorporated the SFP "reasonable time" language into the policy.

¶ 124    Meza accepted the ACV but that will not change the result: he had a reasonable time to complete the repair and/or replacement after the fire to seek further damages.

¶ 125    Whether the process of hiring an architect, meeting the City of Chicago requirements, drawing the plans, dealing with the City of Chicago Building Department, hiring a contractor and subcontractors and actually doing the construction over a Chicago winter within 16 months of the loss was not within a reasonable time leaves an unanswered question of material fact.

¶ 126    This is particularly true since the winter of 2014-2015 appears to have been a difficult construction period. In November 2014 there were 17 days below freezing; in December 2014, there were 14 days below freezing; in January 2015, there were 22 days below freezing; in February 2015, there were 17 days below freezing; and in March 2015 there were 7 days below freezing. (See https://www.timeanddate.com/weather/usa/chicago). "An appellate court may take judicial notice of readily verifiable facts if doing so will aid in the efficient disposition of a case, even if judicial notice was not sought in the trial court." (Internal quotation marks omitted.) *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37 (quoting *Illinois Department of Human Services v. Porter,* 396 Ill. App. 3d 701, 725 (2009)). Clearly construction in Chicago from November 2014 to March 2015 was going to be limited and challenging due to harsh weather.

¶ 127    And a resolution of this issue is complicated by the fact that Country's letters to Meza repeatedly informed him that he had both a "reasonable time" and only "one year from the loss" to complete the work.

¶ 128    Country admits it sent a letter to Meza on November 11, 2014, in which Country stated:

> "[Y]our policy speaks to a 'reasonable time frame wherein all repairs must be done***and that we realize that your contractor may have to have plans drawn to satisfy the City of Chicago and this may take some time. However, the important thing is that he gets started to him can finish in a reasonable time…. you will have one year from the date of loss to present documentation regarding the claim as noted above. Your one-year deadline is July 11, 2015."

¶ 129    In its answer to Meza's amended complaint, Country admitting sending a letter to Meza on January 5, 2015, stating that "[y]our claim remains open pending the completion of repairs to your dwelling," and that "[w]e realize that your contractor may have to have plans drawn to satisfy the

City of Chicago and this may take some time. However the important thing is that he gets started so he can finish in a reasonable time frame." Country further acknowledged that the letter stated Meza "will have one year from the date of loss to present documentation regarding the claim as noted above," and that Meza's deadline was July 11, 2015.

¶ 130    Whether these internally inconsistent letters from County to Meza induced him to believe he had a reasonable time to complete the work is a question of material fact that is unanswered. However, we note that this internal inconsistency cannot be read against Meza. Country chose the words in the letters and it is unclear how an insured can have both a reasonable time and only one year at the same time. "Generally speaking, if a provision of an insurance contract can reasonably be said to be ambiguous it will be construed in favor of the insured and against the insurer, who was the drafter of the instrument." *United State Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1, 4 (1981).

¶ 131    If an ambiguous policy can be construed against the drafter, it would be fair that an ambiguous letter sent by its agent can also be held against it.

¶ 132    Further, it is telling that Country did not indicate in any letter that its own policy includes a Conformity to State Statute clause which by definition includes the SFP's more lenient language which extends the time to complete the repairs to a "reasonable time" instead of "one year."

¶ 133    Because the court decided that because Meza did not complete the work within one year of the date of loss it erred as a matter of law when it ignored the more lenient language of the SFP which gave him a reasonable time. The decision on whether the work was completed in a reasonable time is a material question of fact that must be decided against the backdrop of the policy's Conformity to State Statute clause and the SFP and the facts in this case.

¶ 134 "Generally, the question of what is a reasonable time is a question of fact to be decided by the jury, but if there is no controversy as to the facts, the question of reasonableness is for the judge to decide." *Jones v. Universal Casualty Co.* 257 Ill. App. 3d 842, 853 (1994) (citing *Illinois Valley Minerals Corp.* v. *Royal-Globe Insurance Co.*, 70 Ill. App. 3d 296 (1979)).

¶ 135 According to the policy and the SFP Meza had a reasonable time to repair or replace the property after receiving the check for the ACV and then claim the depreciation holdback, or remainder of the RC, as long as the claim did not exceed the amount it cost to accomplish the repair or replacement.

¶ 136 Next, we need to determine if and when the claim was denied. Country has at various times stated that it never denied the claim, that it rebutted the claim and that it denied the claim. We find that Country denied the claim on November 9, 2015. The letter from its agent, Charles Warren makes it perfectly clear that Country will not pay any more money to Meza over the ACV already paid. The plain language is a denial of the claim, and Country does not challenge Warren's agency or disavow the letter or its content.

¶ 137 To summarize, we find that: (1) the suit was timely filed because Country was required to request a proof of loss but never did; (2) Country's denial was therefore premature; (3) Meza had a reasonable time to complete the repairs/replacement to home; (4) if the 16 months it took was reasonable is a question of fact for the trier of fact; (5) that the SFP supersedes Country's policy on the length of time for repair/replacement; and (6) that summary judgment for County should not have been granted.

¶ 138 For the reasons above we affirm the order of March 7, 2018 in which the court denied the early cross motions for summary judgment. We reverse the order of June 7, 2018 granting summary judgment in favor of Country and dismissing the case with prejudice.

¶ 139   We remand without prejudice, that is, Meza may file a motion to file a second amended complaint, and Country may, of course, respond as necessary.

¶ 140   CONCLUSION

¶ 141   Affirmed in part; reversed in part; and remanded with instructions.

**ENQRIQUE MEZA v. COUNTRY MUTUAL INSURANCE COMPANY**

2020 IL App (1st) 181456-U

Appendix 1 to Order entered January 14, 2020

**Meza v. Country Mutual**                                    **APPENDIX 1, A**

**TIME TO REPAIR**

| **POLICY** | **ENDORSEMENT** | **SFP** |
|---|---|---|
| c. Loss Settlement 1.d.  You may choose at your election to accept ACV instead of RC.  If you do so you will have one year from the date of the loss to repair or replace the damaged property and request the difference between ACV and RC | None in Policy on this matter | [ ] This company [ ] does insure the insured named above [ ] to the extent of ACV of the property at time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a ***reasonable time*** after such loss |

**Meza v. Country Mutual**                                    **APPENDIX 1, B**

**TIME TO SUE**

| POLICY | ENDORSEMENT | SFP |
|---|---|---|
| ~~Conditions G~~ ~~No action can be~~ ~~brought against~~ ~~us unless there~~ ~~has been full~~ ~~compliance~~ ~~with all of the~~ ~~terms under Sect. 2~~ ~~through 6 of~~ ~~this policy~~ ~~and the~~ ~~action is started~~ ~~within one year~~ ~~after the date~~ ~~of the occurrence~~ [this section deleted in the policy] | Conditions G No action can be brought against us unless there has been full compliance with all of the terms under Sect. 2 through 6 of this policy and the action is started within one year after the date of the occurrence. *However, this one year period is extended by the number of days between the date of the proof of loss and the date the claim is denied in whole or in part.* | Suit (Lines 157-161) No suit or action of this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of the policy shall have been complied with and unless commenced within 12 months after the inception of the loss. |